

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

NORTHROP GRUMMAN SHIP SYSTEMS, INC.                    PLAINTIFF
formerly known as INGALLS SHIPBUILDING, INC.

VERSUS                                CIVIL ACTION NO. 1:02cv785 GR

THE MINISTRY OF DEFENSE OF THE REPUBLIC
OF VENEZUELA AND THE BANK OF NEW YORK,              DEFENDANTS

---

## COMPLAINT FOR

1. **ORDER COMPELLING ARBITRATION**
2. **BREACH OF CONTRACT**
3. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
4. **DEFECTIVE SPECIFICATIONS**
5. **SUPERIOR KNOWLEDGE**
6. **QUANTUM MERUIT**
7. **UNJUST ENRICHMENT**
8. **MARITIME LIEN (VERIFIED)**
9. **DECLARATORY AND INJUNCTIVE RELIEF (Count 1)**
10. **DECLARATORY AND INJUNCTIVE RELIEF (Count 2)**

---

## NATURE OF THE ACTION

1.      Northrop Grumman Ship Systems, Inc. (formerly known as Ingalls

Shipbuilding, Inc.) (herein, "Ingalls") contracted with The Ministry of Defense of the

Republic of Venezuela ("The Ministry") to perform certain specified work on two frigates in

1

accordance with specifications provided by The Ministry.  The Ministry breached the contract

by, among other things,

    a.       providing the two frigates in a condition that did not correspond to the

                 specifications' requirements,

    b.       providing defective specifications,

    c.       failing to disclose its superior knowledge regarding the true condition of the

                 frigates and the true amount of work necessary to repair them,

    d.       significantly altering the scope of work, by demanding that Ingalls perform

                 work outside of the specifications,

    e.       delaying and disrupting Ingalls' work, and

    f.       wrongfully refusing to pay for necessary additional work that was a product of

                 The Ministry's flawed specifications, the unforeseeably, excessively

                 deteriorated condition of the frigates, advances in technology, and the changes

                 to the scope of work demanded by Venezuela's Navy.

    2.       The Ministry's breaches of contract stem from two principal technical issues:

(a) the inadequacy of The Ministry's specifications and (b) the fact that much of the work

Ingalls was ultimately required to perform lay outside the contractual specifications.  The

Ministry has refused to negotiate in good faith to resolve these technical issues.

Consequently, Ingalls brings this action to compel arbitration, to recover damages, and to

impose a maritime lien.

    3.       In addition, The Ministry caused funds for payments under the contract to be

placed in trust with the Bank of New York ("BONY"), but The Ministry has refused to honor

its contractual commitment to use those funds exclusively to pay Ingalls for its work on the frigates. Ingalls also seeks the imposition of an express and/or constructive trust over the funds held by BONY.

## JURISDICTION

4.      This Court has jurisdiction over Ingalls' claims against The Ministry pursuant to 28 U.S.C. § 1330(a) because The Ministry is a foreign state as defined by 28 U.S.C. § 1603(a),  which is not entitled to immunity pursuant to 28 U.S.C. § 1605(a)&(b).

## VENUE

5.      Venue is proper in the Southern District of Mississippi pursuant to 28 U.S.C. § 1391(b)&(f).

## PARTIES

6.      Plaintiff Northrop Grumman Ship Systems, Inc. is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Pascagoula, Mississippi.  Northrop Grumman Ship Systems, Inc. was formerly known as Ingalls Shipbuilding, Inc. and is referred to herein as "Ingalls."  At all material times, Ingalls was, and currently is, engaged in the business of constructing, repairing, and otherwise servicing ships.

7.      Defendant The Ministry of Defense of the Republic of Venezuela is an organ of the Republic of Venezuela and is domiciled in Caracas, Venezuela.  The Ministry is a foreign state, as that term is defined in 28 U.S.C. § 1603(a).  At all material times, The Ministry was and is the owner, owner *pro hac vice*, charterer, operator and/or entity in charge and/or control of the maritime vessels known as (ARV) MARISCAL SUCRE (F-21) and

3

009

(ARV) ALMIRANTE BRION (F-22).

8.      Defendant Bank of New York ("BONY") is a New York banking corporation and has its office and place of business at New York City in the State of New York.  BONY is only named as trustee and/or constructive trustee of funds placed with it to ensure payments under the Contract; no damages, costs or fees are sought against BONY.

**GENERAL ALLEGATIONS**

**A.      The Signing of the Contract**

9.      In early 1991, The Ministry solicited bids from various shipyards to modify, modernize, maintain and repair two military frigates called the (ARV) MARISCAL SUCRE (F-21) and (ARV) ALMIRANTE BRION (F-22) (herein, the "Frigates").

10.     The Ministry required that the shipyards base their bids on Work Definitions ("Specifications") prepared and provided by The Ministry.

11.     Ingalls is informed and believes that at all material times, The Ministry was aware that the Specifications it prepared and provided did not reasonably describe the true amount of work necessary to complete the modification, modernization, maintenance and repair of the Frigates.  In addition, at all material times, The Ministry was aware that the modification, modernization, maintenance and repair of the Frigates could not be completed within the time period prescribed by The Ministry.

12.     The Ministry did not disclose that the Specifications it prepared and provided and the work performance period it demanded were not suitable for completing the modification, modernization, maintenance and repair of the Frigates.

13.     Ingalls based its bid to modify, modernize, maintain and repair the Frigates on

4

the Specifications and the work performance period prescribed by The Ministry.

14.     By requiring that Ingalls base its bid on the Specifications and work performance period it provided, The Ministry warranted that Ingalls could complete the job of modifying, modernizing, maintaining and repairing the Frigates (excluding contract changes) within the work performance period using practices and procedures customary in the shipyard industry if it followed The Ministry's Specifications.

15.     Ingalls was the low bidder for the Frigate modification, modernization, maintenance and repair project.

16.     In 1992, The Ministry selected Ingalls to modify, modernize, maintain and repair the Frigates.  The selection was "buena pro."  Under Venezuelan law, a selection "buena pro" means that the contractor has been selected for exclusive negotiations.

17.     In April 1992, The Ministry and Ingalls negotiated a price for the modification, modernization, maintenance and repair of the Frigates.  The total agreed price was $315 million, including a $43 million fund to pay for unforeseen contract changes, $21 million for spare parts; $215 million to pay for Ingalls' contracted base work; and $36 million to pay for the work of certain subcontractors, chosen and designated by The Ministry (the "Designated Subcontractors"), whose work was to be performed under subcontract agreements previously negotiated by The Ministry.

18.     Ingalls had no control over the goods supplied or the work performed by the Designated Subcontractors.

19.     Furthermore, Ingalls' sole obligation with respect to the Designated Subcontractors was to administratively process the subcontracts and make payments to such

5

Designated Subcontractors for the total agreed price.

20.     As a result of numerous delays by The Ministry, the contract between Ingalls and The Ministry was not signed until December 1997 (herein "the Contract").

21.     The Contract provided that Ingalls would perform its work on the Frigates in Pascagoula, Mississippi, and the work of the Designated Subcontractors would be done in whole or in part in other countries.

22.     Under the Contract, the work Ingalls was supposed to perform was limited to the tasks defined by Specifications provided by The Ministry.

23.     Under the Contract, Ingalls had no responsibility for the work of the Designated Subcontractors.

24.     Under the Contract, Ingalls was entitled to compensation for any additional work it was required to perform outside of the Specifications provided by The Ministry.

25.     Under the Contract, Ingalls was entitled to an extension of time and compensation for the delays associated with any additional work it was required to perform outside of the Specifications provided by The Ministry.

26.     Ingalls is informed and believes that between 1992 when the Contract price was negotiated and December 1997 when the Contract was signed, the Frigates continued to be maintained by the Venezuelan navy.

27.     Ingalls is informed and believes that between 1992 when the Contract price was negotiated and December 1997 when the Contract was signed, The Ministry failed to reasonably and properly maintain the Frigates and such failure caused the Frigates' condition to significantly deteriorate.

6

**B.**     <u>**The Ministry's Inadequate Work Definition**</u>

28.     In January 1998, The Ministry delivered the Frigates to Ingalls' shipyard in Pascagoula, Mississippi.

29.     Immediately upon receipt of the Frigates, Ingalls began to incur costs maintaining the Frigates and providing certain housing, medical, and other services to certain personnel assigned by The Ministry to administer the contract.

30.     The Ministry failed to timely make the $57,640,000.00 Advance Payment required by the Contract.

31.     The condition of the Frigates in January 1998 was far worse than the condition of the Frigates when Ingalls and The Ministry agreed to the Contract price and a 20-month production period in 1992.

32.     Since 1992, many parts, components, and systems in the Frigates had become essentially inoperable and had deteriorated due to The Ministry's failure to perform ordinary and routine maintenance and The Ministry's cannibalization of working parts for use on other ships.

33.     Ingalls is informed and believes that The Ministry had superior knowledge about the excessively deteriorated condition of the Frigates prior to entering into the Contract with Ingalls.

34.     The Ministry failed to disclose its superior knowledge about the excessively deteriorated condition of the Frigates before or after entering into the Contract with Ingalls.

35.     In addition, between 1992 and 1997, certain of the Frigates' electronic and mechanical systems had become obsolete so that they could no longer be reasonably repaired,

7

as originally contemplated in the Contract price and the 20-month production period for the originally specified work.

36.     Between January and May 1998, Ingalls and The Ministry negotiated to redefine the scope of work that Ingalls was to perform and to make appropriate adjustments in the Contract price.  These negotiations were called the "Work Definition Conference."

37.     The Work Definition Conference lasted five (5) months, during which time Ingalls was unable to finalize its work plans or commence work on the Frigates.

38.     Ingalls incurred substantial costs and other damages as a result of the delay in firm work definition and initiation of work caused by the uncertainties resulting from The Ministry's Work Definition Conference process.

39.     The Work Definition Conference resulted in substantial changes to the scope of work originally contemplated in the Contract.

40.     Even with the substantial changes in the scope of work, The Ministry's specifications were wholly inadequate to complete the modification, modernization, maintenance and repair of the Frigates.

41.     The Ministry promised to write up formal change orders for all changes agreed to in the Work Definition Conference, but failed to do so.

42.     Furthermore, although The Ministry agreed to more than $42 million in changes as of December 20, 2001, The Ministry had not agreed to extend the scheduled performance period by even one (1) day to implement those changes, thereby breaching its duty to Ingalls to act reasonably and in good faith.

43.     Under the Contract, The Ministry had a duty to negotiate in good faith

8

(a) changes in the scope of work originally contemplated by the parties, (b) equitable price adjustments associated with those changes, and (c) reasonable adjustments in the Contract performance schedule required by such changes.

44.     Before beginning work, Ingalls expressly advised The Ministry that rapid resolution of change requests would be critical to complete the work on the Frigates within the 20-month time period The Ministry specified for completion of the Contract.  Ingalls further advised The Ministry that delays in approving change requests would result in Ingalls incurring substantial costs which would be The Ministry's responsibility to pay.

45.     Throughout Ingalls' work on the Frigates, The Ministry consistently dragged its feet in considering change requests, taking on average more than five times as long to process the requests as the U.S. Navy does for similar requests.

46.     The Ministry's failure to timely approve necessary changes disrupted Ingalls' work on the Frigates and caused Ingalls to be damaged by the resulting delays.

47.     The Ministry's failure to adjust the Contract performance period for its approved changes, coupled with The Ministry's threats to assess Liquidated Damages in the amount of several million dollars, caused Ingalls to incur further damages for overtime and other accelerated efforts attempting to mitigate Ministry-caused delays.

## C.     Technical Issues Related to the Extensive Work Outside the Contract's Specifications that Ingalls was Required to Perform

48.     As a result of The Ministry's delays, Ingalls could not begin its work on the Frigates until June 1998.

49.     To make the Frigates safe and sanitary for its workers and to make it possible

9

for Ingalls to complete the work it originally contracted to perform, Ingalls was required to

perform substantial work not provided for in the Specifications prepared and provided by The

Ministry or agreed to in the Work Definition Conference.  This work is referred to herein as

the "Extra Work."

     50.    As a consequence of having to perform the Extra Work, Ingalls experienced

significant, costly delays in production.

     51.    Among other things, the Frigates suffered from the following defects that were

not previously known to Ingalls, all of which caused or contributed to Ingalls' having to

perform Extra Work as well as causing Ingalls to experience significant delays in

accomplishing the originally specified work:

       a.    Excessive rust was present throughout the Frigates;

       b.    Saltwater had damaged the interior sections of the ships and the gas

           turbines;

       c.    Asbestos was present despite The Ministry's written representation and

           warranty that no asbestos was on the Frigates;

       d.    Electrical, electronic, and/or other components and parts that had

           previously been on the Frigates had been removed;

       e.    Several decks were so badly deteriorated that they needed to be

           repaired before Ingalls' workers could safely gain access to areas

           necessary to complete the originally specified work;

       f.    One of the Frigates had several rounds of live ammunition on board,

           despite The Ministry's representation that the Frigates would be

delivered to Ingalls free of any ammunition.

52.    The problems experienced with the Frigates' gas turbine engines provide one example of the substantial delays and enormous additional costs that Ingalls suffered as a result of technical problems caused by The Ministry's inadequate specifications.

53.    When the Frigates were delivered to Ingalls, the Frigates' gas turbine engines did not work.

54.    Ingalls restored the Frigates' gas turbine engines to working order.

55.    After fixing the gas turbine engines, Ingalls discovered during sea trials that the Elta 3D Radar antenna was positioned directly in the way of the exhaust from the gas turbine engines.  The heat from the exhaust of the gas turbine engines damaged the Elta 3D Radar antenna.

56.    Because of the position of the Elta 3D Radar antenna, the gas turbine engines could not be operated without damaging the antenna.

57.    The position of the Elta 3D Radar antenna was part of the original design of the Frigates and was not chosen by Ingalls.

58.    Ingalls is informed and believes that The Ministry was aware that the Elta 3D Radar antenna was located in the path of the gas turbine engines' exhaust.  Nevertheless, The Ministry concealed this superior knowledge and failed to inform Ingalls that restoring the gas turbine engines to working order would result in the Elta 3D Radar antenna being damaged when the gas turbine engines were operated.

59.    Because the gas turbine engines were inoperable when The Ministry delivered the Frigates to Ingalls, Ingalls had no way of discovering that the location of the Elta 3D

11

011

Radar antenna was incompatible with the operation of the gas turbine engines.

60.     There is nothing in the Specifications that required Ingalls to relocate the Elta 3D Radar antenna.

61.     Nevertheless, The Ministry demanded that Ingalls develop and implement technical solutions to allow the gas turbine engines to operate without damaging the Elta 3D Radar antenna.

62.     Ingalls has expended a great deal of time, effort and money searching for and attempting to implement solutions to prevent heat damage to the Elta 3D Radar antenna from the exhaust of the gas turbine engine.

63.     There exists a doubt and difference between The Ministry and Ingalls over the technical question of whether the work to prevent heat damage to the Elta 3D Radar antenna is inside or outside the scope of the Contract's Specifications.

64.     Other technical doubts and differences exist between The Ministry and Ingalls. For example, between 1992 when the Contract price was agreed to and 1998 when The Ministry finally delivered the Frigates to Ingalls' yard, many machines and components that Ingalls had contracted to repair had become obsolete and spare/replacement parts were no longer available.  As a result, Ingalls was required to replace these machines and components, even though such work was not contemplated by the parties when they agreed upon the price or when they entered into the Contract.  There is a dispute over whether the Contract's technical specifications required Ingalls to bear the costs resulting from parts obsolescence or whether the use of updated materials falls outside the technical Specifications.

65.     The Ministry has acknowledged the existence of outstanding technical

12

disputes with Ingalls on multiple occasions, including but not limited to the following:

> a.      in the Act of Final Acceptance for the Frigate "Mariscal Sucre" F-21, signed by The Ministry on May 14, 2002;
>
> b.      in correspondence dated June 19, 2002, with Banco Mercantil, a Venezuelan bank, The Ministry reiterated its position that technical disputes with Ingalls remain outstanding;
>
> c.      in correspondence to Ingalls dated September 23, 2002, The Ministry criticized the "technical capacity" of Ingalls' personnel and listed a number of outstanding technical issues related to (a) the 127/54 mm Cannon, (b) the ELSIRA electronic warfare system, (c) the starboard 40/70 mm Machine Gun, and (d) the gas turbine engines.

66.     Ingalls incurred substantial costs because of the Extra Work and the delays and disruptions caused by such Extra Work.

67.     The Ministry has not compensated Ingalls for all of the costs it incurred performing the Extra Work, nor has The Ministry recognized any time extensions for such Extra Work.

68.     All of the Extra Work was performed with the knowledge and consent or at the direction of The Ministry which has at all material times had a large force (at times up to 70 persons) present in Ingalls' shipyard and/or aboard the Frigates on a daily basis.

69.     All of the Extra Work was furnished at the prevailing rates at the time for such work in Pascagoula, Mississippi or at the location where subcontractors performed Extra Work.

**D.**     **The Ministry Was Aware of the Extra Work Being Performed by Ingalls**

70.     The Ministry was represented at Ingalls' facility by a group of military personnel called the Venezuelan Inspection Commission or "V.I.C." Under Clause 5 of the Contract, the V.I.C. represented The Ministry "for all purposes related to the purpose of this Contract."

71.     The V.I.C. had full access to Ingalls' shipyard and the Frigates while Ingalls was performing its work, including the Extra Work.

72.     The V.I.C. also reviewed engineering drawings and other documents submitted by Ingalls that depicted the mandatory Extra Work Ingalls was performing.

73.     Ingalls also submitted formal Requests for Additional Work to the V.I.C. and to The Ministry.

74.     The V.I.C. often took months to respond to Ingalls' Requests for Additional Work and sometimes the V.I.C. never even responded at all.

75.     While it waited for the V.I.C. and The Ministry to formally authorize certain essential changes to the scope of work, Ingalls acted as a reasonably prudent shipbuilder and in accordance with standard shipbuilding industry practices by going forward with the out-of-scope work that was necessary for Ingalls to bring the Frigates to the proper condition envisioned when the Contract was executed.

76.     In fact, Clause 8 of the Contract mandated that, "while the change is in the process of being incorporated, it shall not affect the fulfillment of the Contract."

77.     The only way that Ingalls could minimize the impact that necessary changes would have on the execution of the Contract was to go forward with the changes while

14

waiting for formal approval from the V.I.C. and The Ministry.

78.     In Clause 8 of the Contract, The Ministry recognized that growth in the scope of Ingalls' work was inevitable. For that reason, Clause 2 of the Contract provided $42.9 million for "extras and/or contingencies."

79.     The V.I.C. also had informal daily meetings and formal weekly progress meetings with Ingalls in which Ingalls' representatives repeatedly stated that Ingalls was being required to perform substantial work outside the scope of the Contract's Specifications.

80.     The V.I.C. directly observed and supervised all of the Extra Work Ingalls was required to perform.

81.     The V.I.C. never objected to Ingalls performing the Extra Work and often specifically directed Ingalls to complete it.

82.     Neither The Ministry nor the V.I.C. ever told Ingalls that it should not perform the Extra Work. On the contrary, The Ministry and the V.I.C. repeatedly demanded that Ingalls press forward with completing the modification, modernization, maintenance and repair of the Frigates despite the need for Ingalls to perform the Extra Work.

83.     Moreover, The Ministry and the V.I.C. threatened to withhold progress payments unless Ingalls completed certain milestones, even though The Ministry and the V.I.C. knew that, to complete those milestones, Ingalls would have to perform Extra Work.

84.     The Ministry's and the V.I.C.'s conduct amounted to a modification of the Contract to authorize Ingalls to perform the Extra Work and to collect payment for that work.

E.     **Force Majeure**

85.     During its work on the Frigates, Ingalls experienced delays beyond its control,

15

including delays attributable to a hurricane, a labor strike, and delays in the U.S. Government issuance of appropriate import/export licenses for certain materials and/or information, and delayed performance by certain subcontractors, including The Ministry's Designated Subcontractors.

86.     Clause 29 of the Contract between Ingalls and The Ministry excuses Ingalls' performance for "UNFORSEEN OR FORCE MAJEURE EVENTS", which are defined in the Contract as "circumstances or events and their consequences that are out of 'THE CONTRACTOR's' or its subcontractors' and Designated Subcontractors' control, that may arise after the effectivity of this Contract, that might prevent any of the parties from fulfilling their obligations such as: . . . strikes . . . prohibition of imports or exports, natural catastrophes, floods, abnormal weather conditions, [and] dock worker strike."

87.     The strike, hurricane, subcontractor delays, material unavailability, import-export license delays, and other causes of delays were beyond the reasonable control of Ingalls and constitute unforseen events and force majeure under Clause 29 of the Contract.

88.     Clause 3, Fifth Paragraph, of the Contract provides that:

The deadlines indicated in this Clause for delivery of 'THE SHIPS' and the appropriate documentation may be postponed without penalty to 'THE CONTRACTOR' and be charged against the contingencies set forth in the Eighth Clause, among other reasons, for the following causes: (a) Circumstances or events due to unforseen or force majeure events, as set forth in the Twenty-Ninth Clause of this Contract . . . (c) When additional and/or unforseen work is performed according to the Eighth Clause, as long as an additional time is agreed upon for the execution of the work. (d) When tests are repeated for reasons outside the responsibility of "THE CONTRACTOR", its subcontractors or the Designated Subcontractors.  Should that occur, an explanatory document shall be prepared, which must be accepted in writing and signed by both parties. (e) Should 'THE MINISTRY' and/or the Designated Subcontractors fail to make available the equipment mentioned in

this clause and its Second Paragraph, within the deadlines indicated therein, 'THE CONTRACTOR' may extend the scheduling of the deliveries for a number of days equal to the delay in receiving the equipment at the facilities of 'THE CONTRACTOR' or Designated Subcontractors, without penalty for 'THE CONTRACTOR', leaving intact the responsibility of the Designated Subcontractors, if any.

89.     Among other things, Clause 8 of the Contract requires The Ministry to pay for unforeseen costs due to unforseen events and force majeure.  The Ministry granted a 150-day extension for force majeure events, but did not pay even one dollar of the force majeure delay costs.

90.     Under Clause 3 and Clause 8 of the Contract, Ingalls is entitled to contract schedule extensions and payment for the delays and damages it experienced as a result of the labor strike, the hurricane, the delays in obtaining the required import-export licenses, delays caused by changes and Extra Work, and delayed performance by subcontractors.

91.     The Ministry knows that it owes Ingalls compensation for the delays and damages Ingalls has experienced as a result of circumstances or events beyond Ingalls' control.  Nevertheless, The Ministry has refused to pay Ingalls.

**F.     Ingalls' Attempts to Negotiate Equitable Adjustments**

92.     The Contract obligates The Ministry to promptly negotiate and pay for changes to the Contract's scope of work and to extend the performance schedule for such changes.

93.     Specifically, Clause 59 of the Contract provides:

> If during the execution of this Contract it is decided to do additional work, repairs, services, supplies and tests not included in "THE SPECIFICATIONS" which are considered absolutely necessary to fulfill the purpose of this Contract and

17

**017**

that are not included in the agreed total price, 'THE CONTRACTOR' and 'THE MINISTRY' shall determine by mutual agreement the work and prices of the work and how these shall influence the delivery deadlines and shall undersign the supplementary agreements as needed, with the approval of the General Controller's Office of the National Armed Forces.

94.     The Ministry has not negotiated in good faith to establish the scope and prices for the mandatory additional work, repairs, services, supplies and tests that Ingalls provided that were not foreseen in the Ministry-provided Specifications, all of which were necessary and essential for the good performance of the Frigates.

95.     Before this action commenced, Ingalls repeatedly delivered to The Ministry and/or its agents detailed written statements and accounts describing the Extra Work furnished by Ingalls during the course of its work under the Contract and requesting equitable adjustments in the Contract price and redelivery schedule for the Extra Work and other matters which are compensable under the Contract.

96.     On October 2, 2000, Ingalls delivered to The Ministry a summary proposal that addressed some of the major areas of Extra Work that Ingalls had performed but for which it had not yet been compensated.

97.     On May 22, 2001, Ingalls delivered to The Ministry a 35 page request for equitable adjustment which requested a Contract adjustment of $87 million and an extension in the redelivery schedule until April 24, 2001 based on events and circumstances known as of June 13, 2000.  This document was delivered to the V.I.C. on June 27, 2001.

98.     On August 9, 2001, Ingalls delivered a twelve (12) volume proposal for Contract adjustment to the V.I.C. in Pascagoula and to the Commander of Logistics in

18

Venezuela. This proposal provided details of the summary proposal identified in the previous paragraph, was based on events and circumstances known as of June 13, 2000, and supported a contract adjustment of $87 million and an extension in the redelivery schedule.

99.     On September 6, 2001, Ingalls met with the Controller of the National Armed Forces of Venezuela and showed him a slide presentation that described the reasons Ingalls was requesting a Contract price and redelivery schedule adjustment.

100.    In December 2001, representatives of Ingalls traveled to Venezuela and met with a representative of the Venezuelan Navy and again requested an adjustment to the Contract price and redelivery schedule.

101.    On April 5, 2002, Ingalls sent The Ministry a demand for arbitration pursuant to Clause 41 of the Contract. Ingalls' demand for arbitration was made while both of the Frigates were located in territorial waters of the United States and within the judicial district of this Court.

102.    On August 26, 2002, The Ministry informed Ingalls that it refused to participate in arbitration as required by Clause 41 of the Contract.

G.      **Under the Foreign Sovereign Immunities Act, The Ministry Is Not Immune From Suit in this Case**

103.    The Contract between Ingalls and The Ministry for the modification, modernization, maintenance and repair of the Frigates is a commercial activity as defined in 28 U.S.C. § 1603(d). Because The Ministry's acts as described in this Complaint have had a direct effect in the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1605(a)(2) which allows suits against foreign sovereigns based on commercial activity

19

**019**

carried on in the United States.

104.    In addition, through this Complaint, Ingalls seeks to enforce an agreement

made by The Ministry to submit to arbitration.  That arbitration was intended to take place

and should take place in the United States and the arbitration is governed by a treaty in force

in the United States calling for the recognition and enforcement of arbitral awards as

provided in 28 U.S.C. § 1605(a)(6)(A)&(B).

**FIRST CLAIM FOR RELIEF**
**Petition for an Order Compelling Arbitration**
**(Against The Ministry)**

105.    Paragraphs 1 through 104 of this Complaint are incorporated herein by

reference.

106.    Clause 41 of the Contract provides that "the contracting parties hereby agree

that in the case of any doubts or differences of opinion regarding a technical matter, they shall

submit the matter to be decided by a Three Expert Commission to be selected by mutual

agreement of the parties."

107.    Under Clause 41 of the Contract, the decision of the panel of technical experts

"will be final and binding on the contracting parties."

108.    Clause 41 of the Contract further provides that this arbitration before a panel

of technical experts shall take place in Pascagoula Mississippi.

109.    The doubts and differences with The Ministry raised herein regard "technical

matter[s]" as that term is used in Clause 41 of the Contract, including, but not limited to,

differences regarding:

   a. The scope of the Ministry-provided Specifications;

20

   b.  Whether Ministry-demanded changes fall outside the contractual Specifications; and

   c.  The extent to which Ministry-demanded technical changes delayed and disrupted Ingalls' work on the Frigates.

110. Ingalls has requested that The Ministry submit to arbitration pursuant to Clause 41 of the Contract.

111. The Ministry unreasonably delayed in responding to Ingalls' request for arbitration under Clause 41 of the Contract. Ultimately, The Ministry refused to submit to the contractually required arbitration.

112. Ingalls is entitled to an order compelling The Ministry to submit to the contractually required arbitration in Pascagoula, Mississippi.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**(Against The Ministry)**

113. Paragraphs 1 through 104 of this Complaint are incorporated herein by reference.

114. The Ministry had a written Contract with Ingalls for the modification, modernization, maintenance and repair of the Frigates.

115. The Ministry breached its written Contract with Ingalls, by doing, among other things, the following acts:

   a.  providing defective Specifications that did not describe all the work necessary to modify, modernize, maintain and repair the Frigates;

   b.  delivering the Frigates to Ingalls' shipyard in a condition that did not

21

conform to the express requirements of the Contract or the parties' expectations when the Contract was signed;

c.   failing to disclose hidden defects in the Frigates that substantially increased the amount of work and the cost necessary to complete the Frigates;

d.   demanding and requiring that Ingalls perform added and changed work that was not required by the Contract or the Specifications;

e.   failing to cause and enable The Ministry's Designated Subcontractors to perform their work on the schedule set forth in the Contract for their work;

f.   failing to make payments for Contract work and agreed changes on the schedules set out in the Contract and/or delaying such payments until Ingalls performed or agreed to perform Extra Work not required by the Contract or paid for by The Ministry;

g.   disrupting the progress of Ingalls' work on the ships by unreasonably delaying or denying formal approval of necessary changes; and

h.   refusing to negotiate in good faith.

116.   The Ministry has also breached the Contract by failing to comply with the dispute resolution provisions of the Contract.

117.   Clause 41 of the Contract states that all doubts or differences regarding any technical matter in the performance of the Contract be submitted to a panel of three technical experts whose decision will be final and binding over the parties.  Under the Contract, the

22

022

panel of technical experts will function in the city of Pascagoula, Mississippi and the decision of the technical expert panel will be binding on the contracting parties.

118.    Ingalls has requested that The Ministry participate in the contractually required submission to the three technical experts.  The Ministry has refused to participate.

119.    Ingalls performed all of its obligations under the Contract, except those that were excused by The Ministry's breaches of Contract or by The Ministry's consent.

120.    Accordingly, Ingalls prays for an order of specific performance requiring The Ministry to participate in the technical expert panel to resolve the outstanding technical problems.

121.    Furthermore, The Ministry's breaches were the legal cause of substantial delays, added costs, and damages to Ingalls.

122.    The Ministry's breaches caused Ingalls to suffer hundreds of millions of dollars of damages, in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against The Ministry)

123.    Paragraphs 1 through 104 and Paragraphs 113 through 122 of this Complaint are incorporated herein by reference.

124.    There is implied in the Contract between Ingalls and The Ministry a duty of good faith and fair dealing.

125.    The Ministry breached its duty of good faith and fair dealing by, among other things:

   a.  unreasonably delaying or denying formal approval of necessary

changes to the Contract's Specifications;

b.      concealing the true excessively deteriorated condition of the Frigates;

c.      unreasonably withholding substantial payments due Ingalls under the

Contract until Ingalls proceeded with Extra Work not required by the

Contract;

d.      demanding that Ingalls accelerate performance of Contract work and

changes and threatening Ingalls with Liquidated Damages for alleged

late performance;

e.      cannibalizing parts and components from the Frigates; and

f.      failing to negotiate in good faith Ingalls' request for an equitable

adjustment in the Contract price and redelivery schedule.

126.    Ingalls has been damaged by The Ministry's breach of its duty of good faith

and fair dealing, in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF
**Defective Specifications**
**(Against The Ministry)**

127.    Paragraphs 1 through 104 of this Complaint are incorporated herein by

reference.

128.    The Ministry was under a legal duty to provide Ingalls with Specifications

that, if followed using practices customary in the shipyard industry, would result in

completion of the originally specified modernization, modification, maintenance and repair

of the Frigates within the time frame allotted by The Ministry.

129.    The Ministry was also under a legal duty to provide Specifications for work by

24

Ingalls' subcontractors that, if followed using practices customary in the applicable subcontractor's industry, would result in the full completion of the subcontractor's portion of the originally specified work on the Frigates.

130.   The Specifications provided by The Ministry to Ingalls were defective because additional work not included in the Specifications and not formally agreed to by The Ministry as contract changes was necessary to complete the modification, modernization, maintenance and repair of the Frigates.

131.   The Specifications provided by The Ministry to Ingalls were also defective because the originally specified work could not be completed in the time period allowed by The Ministry in the Contract.

132.   The Specifications provided by The Ministry to Ingalls' subcontractors were defective because additional work not included in the Specifications was necessary for the subcontractors to complete their portion of the work on the modification, modernization, maintenance and repair of the Frigates.

133.   Ingalls based its agreement to the Contract price and redelivery schedule on the defective Specifications provided by The Ministry.

134.   Ingalls has been damaged by The Ministry's provision of defective Specifications in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### Superior Knowledge
### (Against The Ministry)

135.   Paragraphs 1 through 104 of this Complaint are incorporated herein by reference.

25

136.    Ingalls is informed and believes that The Ministry possessed superior knowledge about the true excessively deteriorated condition of the Frigates and the true ability of the Designated Subcontractors.

137.    The Ministry did not disclose to Ingalls its superior knowledge about the true excessively deteriorated condition of the Frigates.

138.    Ingalls was damaged by The Ministry's failure to disclose its superior knowledge in that, among other things, Ingalls agreed to a Contract redelivery schedule far shorter, and a price far lower than the true amounts necessary to modify, modernize, maintain and repair the Frigates to suit The Ministry's standards and requirements which were not disclosed to Ingalls until after Contract award.  Ingalls was damaged in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
**Quantum Meruit**
**(Against The Ministry)**

139.    Paragraphs 1 through 104 of this Complaint are incorporated herein by reference.

140.    With The Ministry's full knowledge and consent, Ingalls has performed substantial services on behalf of The Ministry above and beyond the work contemplated in the written Contract between the two parties.

141.    Ingalls has not been paid for the services that it provided to, and were accepted by, The Ministry that were above and beyond the work contemplated in the written Contract between the two parties.

142.    Ingalls is entitled to the fair and reasonable value of the services it has

performed on behalf of The Ministry for which it has not been paid, in an amount to be
determined at trial.

### SEVENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against The Ministry)**

143.    Paragraphs 1 through 104 of this Complaint are incorporated herein by
reference.

144.    With the full knowledge and consent of The Ministry, Ingalls has performed,
and The Ministry has accepted, substantial Extra Work on the Frigates above and beyond the
work contemplated in the Contract between the two parties.

145.    Ingalls has not been paid for the Extra Work it performed above and beyond
the work contemplated in the Contract between the two parties.

146.    In addition, as a result of The Ministry's actions, Ingalls suffered many costly
delays and other negative impacts in the progress of its work on the Frigates, for which it has
not been compensated.

147.    The Ministry has derived, but has not paid for, substantial benefits from
Ingalls' Extra Work.

148.    Ingalls is entitled to be compensated for the reasonable value of the Extra
Work it performed on the Frigates and for The Ministry-caused delays and other impacts, in
an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
**Maritime Lien**
**(Against The Ministry)**

149.    Paragraphs 1 through 104 and Paragraphs 113 through 147 of this Complaint

are incorporated herein by reference.

150.    With the full knowledge and consent of The Ministry, Ingalls has provided service, supplies and repairs to the Frigates that are necessary to place the Frigates in a seaworthy condition and permit the continued operation of the Frigates.  All of Ingalls' work was performed in a good and workmanlike manner and in accordance with industry standards, and such work was witnessed and approved by The Ministry and/or its agents.

151.    Ingalls has requested payment from The Ministry and/or its agents for the work performed and the material supplied to the Frigates, but The Ministry has not paid for such work and material.

152.    The requested payment represents charges that are fair and reasonable for the work done and materials supplied to the Frigates.  Upon information and belief, this sum  is not less than $200 million.

153.    At all material times, the frigate (ARV) ALMIRANTE BRION (F-22) was, and currently is, present in the navigable waters of this judicial district and within the jurisdiction of this Honorable Court.

154.    Under the Federal Maritime Lien Act, 46 U.S.C. § 31341 *et seq.*, Ingalls has a maritime lien on the F-22 frigate in the amount of the value of the services and supplies it provided to the vessel, plus all costs associated with the collection of this debt, including, but not limited to, attorneys' fees, expenses and judicial interest, against the vessel and/or The Ministry for the work and materials Ingalls furnished the vessel.

155.    As a result of the foregoing, the F-22 frigate and/or The Ministry are justly and truly indebted to Ingalls and Ingalls is entitled to recover from the F-22 frigates and/or The

028

Ministry in the full amount of not less than $200 million, plus all costs associated with the

collection of this debt, including but not limited to, attorneys' fees, expenses and judicial

interest, plus other damages to be proven at trial.

## NINTH CLAIM FOR RELIEF
### Declaratory and Injunctive Relief
### (Against The Ministry and BONY)

156.   Paragraphs 1 through 104 and Paragraphs 113 through 155 of this Complaint

are incorporated herein by reference.

157.   Clause 2 of the Contract provided the following:

> In order to make the payments planned under this Contract, the Ministry of
> Finance of the Republic of Venezuela shall issue Eurobonds for the sum of
> $315,000,000.00 in a private placement by ING Barings (US) Securities
> converted to US dollars.  The results of the issue will be placed in a trust fund
> created by the Ministry of Finance and the Bank of New York, New York,
> United States of America with the sole and specific purpose of making the
> payments under this Contract.  (Emphasis added).

158.   Pursuant to the express terms of the Contract, The Ministry caused funds to be

placed in a trust established by the Republic of Venezuela with BONY for the sole and

specific purpose of making payments to Ingalls under the Contract.

159.   In the course of performance, BONY has paid out funds from this trust

account to Ingalls on the instructions of The Ministry.

160.   BONY has legal title to or possession or control over the funds in the trust

account.

161.   By reason of the substantive allegations above against The Ministry, BONY is

the actual or constructive trustee of said funds for Ingalls' benefit as against any claim to the

29

029

funds by The Ministry.

162.    of the money presently held by the BONY derived from the proceeds from the sale of bonds by The Ministry to finance payment for Ingalls' work on the Frigates.  Ingalls contends that the money presently being held by the BONY is in an actual or constructive trust, that Ingalls is the beneficiary of that trust, that the funds in the trust can only be used to pay Ingalls for its work on the Frigates, and that the trust funds may not be released for any purpose inconsistent with the satisfaction of all outstanding obligations The Ministry has to Ingalls.  Ingalls is informed and believes that The Ministry and the BONY disagree.

163.    Ingalls is entitled to, and prays for, an adjudication of its rights and obligations with respect to the other parties concerning the interpretation of Clause 2 of the Contract and an adjudication that the money presently being held by the BONY is in an actual or constructive trust, that Ingalls is the beneficiary of that trust, that the trust funds can only be used to pay Ingalls for its work on the Frigates, and that the trust funds may not be released for any purpose inconsistent with the satisfaction of all outstanding obligations The Ministry has to Ingalls.

### TENTH CLAIM FOR RELIEF
**Declaratory and Injunctive Relief**
**(Against The Ministry)**

164.    Paragraphs 1 through 104 and Paragraphs 113 through 163 of this Complaint are incorporated herein by reference.

165.    Pursuant to the Contract between Ingalls and The Ministry, Ingalls caused Banco Mercantil, a Venezuelan bank, to issue a performance bond for up to $63 million to guarantee to The Ministry the complete, on-time and substantial performance of Ingalls'

obligations under the Contract.

166.    By its terms, the performance bond expires on the date of issuance of the act of final acceptance (as defined in the Contract) of the last ship.

167.    The act of final acceptance on the last ship will be issued Friday, October 25, 2002.

168.    There has arisen between Ingalls and The Ministry a present and actual controversy as to whether the performance bond may be drawn upon after the issuance of the act of final acceptance on the last ship. The Ministry contends that it may draw on the performance bond despite the issuance of the act of final acceptance on the last ship. Ingalls contends that once the act of final acceptance on the last ship has been issued, the performance bond may not now be drawn upon.

169.    Ingalls seeks a declaration from this Court that, once the act of final acceptance has been issued, the performance bond cannot be drawn upon by The Ministry for any reason.

## PRAYER

WHEREFORE, Ingalls prays for judgment as follows:

1.    For an order requiring The Ministry to participate in the contractually required submission of technical problems to a three-member arbitration panel of technical experts under the following terms:

   a.    Ingalls and The Ministry must each pick one technical arbitrator within 14 days of this Court's order;

31

b.      If one party fails to designate an arbitration within the 14-day period
        prescribed, the arbitrator designated  by the other shall act as the sole
        arbitrator;

c.      The two party-selected arbitrators must designate a third technical
        arbitrator within 28 days of this Court's order;

d.      If the two party-selected arbitrators fail to agree on the third technical
        arbitrator within 28 days of this Court's order, either party may apply to
        the Court to select the third technical arbitrator;

e.      The arbitration shall take place in Pascagoula, Mississippi;

f.      The arbitration shall begin within 120 days after the selection of the
        third arbitrator;

g.      A simple majority of the arbitrators shall be sufficient for the
        arbitration panel to render a final decision and award;

h.      The arbitrators shall render a written decision and award within 45
        days of the end of the presentation of evidence;

i.      The arbitrators' decision shall be final and binding on both Ingalls and
        The Ministry;

j.      This Court shall retain jurisdiction to enforce the order compelling
        arbitration and to enforce the decision and award rendered by the
        arbitrators.

2.      For damages according to proof;

32

032

3.  For restitution of the fair value of the services and supplies Ingalls provided to the Frigates for which it has not been paid;

4.  For a maritime lien to be recognized and enforced in favor of Ingalls and against The Ministry and the (ARV) ALMIRANTE BRION with preference and priority over all other liens or persons in the amount of no less than $200 million;

5.  For a declaration that the funds placed by The Ministry with BONY are held in an actual trust, that Ingalls is the beneficiary of that trust, that the trust funds can only be used to pay Ingalls for its work on the Frigates, and that the trust funds may not be released for any purpose inconsistent with the satisfaction of all outstanding obligations The Ministry has to Ingalls.

6.  For an injunction restraining BONY from transferring, or allowing to be transferred, any of the funds held in the Trust Account, except for the purpose of making payments to Ingalls for its work on the Frigates.

7.  For a declaration that the performance bond issued by Banco Mercantil in favor of The Ministry has expired and cannot now be drawn upon for any reason.

8.  For prejudgment interest;

9.  For attorneys' fees and costs; and

10. For such other and further relief as this Court deems just and proper.

033

Dated:  October _24_, 2002

Respectfully Submitted,

RICHARD P. SALLOUM
FRANKE, RAINEY & SALLOUM, PLLC
2605 Fourteenth Street
P. O. Drawer 460
Gulfport, MS 39502
Telephone: (228) 868-7070
Facsimile: (228) 868-7090

JOSEPH F. COYNE, JR.
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
333 South Hope Street, 48th Floor
Los Angeles, California 90071-1448
Telephone: (213) 620-1780
Facsimile: (213) 620-1398
Attorneys for Plaintiff
NORTHROP GRUMMAN SHIP SYSTEMS, INC.

OF COUNSEL:

ROBERT J. ARIATTI, JR.
Senior Counsel
Northrop Grumman Ship Systems, Inc.
Post Office Box 149
Pascagoula, MS  39568-0149

34

034

## VERIFICATION

I, Samuel Roberts, declare:

I am employed by Northrop Grumman Ship Systems, Inc. (formerly known as Ingalls Shipbuilding, Inc.) and am authorized to make this verification on its behalf. I have read Paragraphs 150 through 155 of the foregoing Complaint and am familiar with their contents. I hereby declare, under penalty of perjury under the laws of the United States, that the factual allegations stated in those paragraphs are true and correct based upon my own personal knowledge, except for those facts alleged upon information and belief, which facts I believe to be true.

Dated: October _23_, 2002

_Samuel Roberts_
SAMUEL ROBERTS

**035**